**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NSC Investment, LLC and TGC/Korea Operating, LLC | Civil Action No. 19-CV-02498 |
| Plaintiff, | |
| -v- | |
| POSCO Engineering & Construction Co., Ltd., | |
| Defendant. | |

**AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND BREACH OF
CONTRACT**

NSC Investment, LLC ("Gale Songdo") and TGC/Korea Operating, LLC ("Gale Korea") (collectively "Gale" or "Plaintiffs"), through counsel, hereby bring this Complaint for Declaratory Judgment and, in the alternative, Breach of Contract against POSCO Engineering & Construction Co., Ltd. ("POSCO E&C"), jointly owned by POSCO Group (PKX) and the Saudi Arabian Public Pension Fund ("PIF") and allege as follows.

**INTRODUCTION**

1.     This dispute concerns POSCO E&C's breaches of its contractual and statutory duties to Gale under two Limited Liability Company Operating Agreements (the "LLC Agreements"), the ownership of which are denominated in "units" and both of which include dispute resolution provisions requiring that all disputes between the parties be settled by binding arbitration under the rules of the International Chamber of Commerce (the "ICC"). Gale has initiated arbitration proceedings (the "ICC Arbitration") pursuant to these provisions.

2.     The LLC Agreements set forth the terms of Gale and POSCO E&C's partnership in developing the New Songdo International Business District ("Songdo" or the "IBD") within the

Incheon Free Economic Zone — a new, "smart-connected" city in the Republic of Korea ("Korea") built on 1,500 acres of land (with 100 million square feet of new building space) reclaimed from the West Sea near the Incheon International Airport.  The total anticipated cost to buy, design, and build out this new metropolis is approximately USD $35 billion

  3.  Plaintiffs Gale Songdo and Gale Korea are the majority owners the two joint venture companies leading the development and management of the IBD.  Respondent POSCO E&C is the minority owner of the two joint venture companies and the primary construction contractor for the IBD.  POSCO E&C has been, and remains, motivated to abuse its dual status as construction contractor and development partner.  As the construction contractor, POSCO E&C enjoys 100 percent of the profits from the construction work it performs in the IBD.  By contrast, as a minority owner of the LLCs, POSCO E&C receives only a portion of the profits from the developed work and real estate sales.

  4.  Gale discovered that POSCO E&C was overcharging for hundreds of millions of dollars for construction work and engaging in other violations of its contractual and statutory duties, such as impermissibly selling shared assets without Gale's approval and resorting to improper accounting practices to create substantial and unnecessary phantom income and potential U.S. tax liabilities for Gale.

  5.  Unable to agree on a resolution to their disputes, POSCO E&C engineered defaults on loan obligations undertaken by Gale Songdo and POSCO E&C's jointly-owned LLC (the "Joint Venture") and then used that default as a pretext to purportedly seize and sell Gale Songdo's units in the Joint Venture.

  6.  In so doing, POSCO E&C divested Gale Songdo of over USD $2 billion in real estate holdings and sold them for approximately USD $15 million — a minute fraction of their

value.  At the time of the purported seizure and sale, Gale had built out more than 70 percent of the new city — developing from a blank canvass an area the size of downtown Boston and, in so doing, creating the largest city ever built from scratch.  POSCO E&C also removed the barrier impeding payment of its fraudulent construction work invoices, totaling more than USD $300 million.

7.      After provoking default and purportedly seizing and selling the units, POSCO E&C sold property, refinanced the Songdo project, and leveraged the Joint Venture's assets to put approximately USD $1 billion into POSCO E&C's pockets.  POSCO E&C's actions confirm that the Songdo real estate holdings — and thus Gale's units in the Joint Venture — are worth billions of dollars and, thus, the USD $15 million sale price was unreasonably low.  The resulting cash flow from the refinancing bolstered POSCO E&C's financial position, improved its financial status and corporate credit rating, thereby priming POSCO E&C for a long-awaited IPO.

8.      As POSCO E&C's own internal documents reveal, that seizure and sale marked the culmination of a calculated plan to oust Gale from the lucrative Songdo project.

9.      POSCO E&C's wrongdoing was wide-ranging and far-reaching.  Each individual course of misconduct constituted an independent contractual and statutory breach.  More fundamentally, POSCO E&C engaged in a continuing and interrelated pattern of improper acts that culminated in the purported seizure and sale of Gale Songdo's units in violation of the JV Agreement, depriving Gale of substantial monies and opportunities which were bargained for and documented in the LLC Agreements.

10.     In addition to violating the LLC Agreements, POSCO E&C's improper purported sale of Gale Songdo's units also constitutes a breach of a separate Unit Pledge Agreement, under which Gale Songdo and POSCO E&C pledged their units in the Joint Venture as collateral for

4836-5761-0904.2

loans for the development of Songdo.  When POSCO E&C engineered the loan default, it seized the opportunity to pay off the loan and step into the lenders' shoes under the relevant loan agreements, thus purportedly obtaining the right to sell Gale Songdo's units to offset the loan balance.  However, the Unit Pledge Agreement required the lenders (and thus POSCO E&C) to sell the units at a reasonable valuation, a requirement POSCO E&C breached by selling the units for a tiny fraction of their value.

11.     The Unit Pledge Agreement does not include an arbitration provision.  Rather, it includes a "permissive" choice of venue provision, conferring jurisdiction on Seoul Central District Court, but not denying jurisdiction to this Court.  Nevertheless, the entire dispute between the parties is subject to arbitration.

12.     *First*, as Gale asserts in the ICC Arbitration, POSCO E&C had no rights under the Unit Pledge Agreement because, in violation of its obligations under the LLC Agreements, it engineered the loan default.  In other words, POSCO E&C never had the right to seize the units, let alone sell them.  *Second*, Gale alleges that even assuming that POSCO E&C properly stepped into the lenders' shoes under the Unit Pledge Agreement, its sale of the units at a fraction of their value violated POSCO E&C's obligations under the LLC Agreements.  *Third*, the parties clearly indicated that all disputes between them related to Songdo should be arbitrated, as they included mandatory arbitration provisions in the LLC Agreements (and in a third agreement governing Songdo that is not directly at issue in this dispute).  *Fourth*, the parties' selected to arbitrate under the ICC rules, which grant the arbitrators the right to determine whether a dispute is arbitrable.

13.     *Fifth*, the Unit Pledge Agreement contains no arbitration provision, but that agreement was between the lenders and the Joint Venture, not between Gale and POSCO E&C. *Finally*, the determination of whether POSCO E&C sold the units at an unreasonable valuation —

and thus breached the Unit Pledge Agreement — is inextricably linked to the resolution of the parties' other disputes in the ICC Arbitration, in particular, to the determination of the extent of POSCO E&C's construction overcharges, which, in turn, affects the value of Gale's units in the Joint Venture.

14.     Accordingly, Gale seeks a declaration that the parties' entire dispute is subject to arbitration.  In the alternative, if it is determined that in addition to arbitrating Gale's allegations that POSCO E&C's improper sale of the units violated the LLC Agreement, the parties may litigate whether POSCO E&C's actions further breached the Unit Pledge Agreement, Gale brings a breach of contract claim in this Court.

## THE PARTIES

15.     Gale Songdo is a limited liability company registered under Delaware law with its primary place of business at 5 Bryant Park, 1065 6th Avenue, New York, NY 10018.

16.     Gale Korea is a limited liability company registered under the laws of Delaware with its primary place of business at 5 Bryant Park, 1065 6th Avenue, New York, NY 10018.

17.     On information and belief, POSCO E&C is a company registered under Korean law, with its registered office at 568-1 Goedong-dong, Nam-gu, Pohang, GyeongBuk, Korea.

## JURISDICTION

18.     This action arises under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention") art. II(1), Jun. 10, 1958, 21 U.S.T. 2517, the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 201-208, the Declaratory Judgment Act, 28 U.S.C. § 2201, and Korean law.

19.     This Court has subject matter jurisdiction over all causes of action stated herein pursuant to 28 U.S.C. §§ 1331, and 1332(a)(2) and 9 U.S.C. § 203.

4836-5761-0904.2

20.     POSCO E&C is subject to personal jurisdiction under New York's long-arm statute because POSCO E&C transacts business in New York, and this claim arises from those business transactions.  N.Y.C.P.L.R.§ 302(a)(1).

21.     In the alternative, POSCO E&C is subject to personal jurisdiction under Federal Rule of Civil Procedure 4(k)(2) because this petition arises under federal law, POSCO E&C has many relevant connections with the United States, and — if POSCO E&C is not subject to jurisdiction in any state's court of general jurisdiction — exercising jurisdiction would be consistent with the United States Constitution.

## VENUE

22.     Venue is proper in the Southern District of New York pursuant to 9 U.S.C. § 204 and 28 U.S.C. § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" in New York City.

## FACTUAL BACKGROUND

**Korea Invites Gale Investments to Develop a New City**

23.     In 2001, Korea invited the predecessor to New York-based The Gale Investments Company, LLC ("Gale Investments") to spearhead the construction of an international business district on 1,500 acres of reclaimed land 35 miles west of downtown Seoul and adjacent to the world class Incheon International Airport.

24.     Korea wished to create a modern "aerotropolis" — an international business hub to rival Singapore, Hong Kong, and Shanghai as a commercial gateway to Northeast Asia designed to entice foreign direct investment and facilitate Korea's emergence from the 1997 Asian Financial Crisis.

4836-5761-0904.2

25.     Korea turned to Gale Investments — a family-owned business founded in New York City in 1922 with a global reputation for developing "smart-connected" cities — to turn this dream into reality.  It was thus at Korea's direct request that Gale Investments brought its vision and expertise to the IBD.   Korea also instructed Gale Investments to use POSCO E&C on the project.

26.     Gale Investment's relationship with Korea was memorialized in a 2002 Land Supply Agreement with the City of Incheon ("Incheon"), which set the terms of the sale of the land that would become the IBD to the Joint Venture.  This sale represented the first time in Korean history that Korea permitted a foreign-controlled entity to own Korean land in fee simple.

27.     Over the course of the next 18 years, Gale Investments worked tirelessly to transform Korea's dream into fact.  Through these efforts, Gale Investments created a widely-lauded futuristic city boasting the landmark NEATT Tower (one of the tallest skyscrapers in Northeast Asia), more than 20,000 residential housing units, a retail mall, luxury hotels, a convention center modeled after the iconic Sydney Opera House, a $280 million arts and culture complex with waterfront views, a world-class international school, a 100-acre Central Park reminiscent of the eponymous park in Gale Investment's hometown, Venetian-style canals, and a Jack Nicklaus Signature golf course and clubhouse.

**The LLC Agreements**

28.     To achieve these results, Gale Investments worked through two affiliates:  Plaintiffs Gale Songdo and Gale Korea.  These affiliates partnered with POSCO E&C through two LLCs, including the Joint Venture, governed by two separate LLC Agreements.

29.     Specifically, in 2002, Gale Songdo and POSCO E&C established the Joint Venture as a Korean "limited liability company" or *yuhan hoesa* (similar to a limited liability company).

4836-5761-0904.2

The Joint Venture's operations are governed by the Joint Venture Operating Agreement (the "JV Agreement").  The purpose of the Joint Venture is to own, manage, operate, develop, and otherwise manage the IBD project.  Ownership in the Joint Venture is denominated in units.  Gale Songdo owns 70.1 percent of the units, and POSCO E&C the remaining 29.1 percent.  Through these units, Gale Songdo owns 70.1 percent of the real estate and development rights in the IBD.

30.     The JV Agreement imposes an explicit good faith obligation on the LLC members. The LLC members agree to "cooperate on behalf of the Company and use commercially reasonable efforts, in good faith, to obtain" loans.  The Joint Venture's Representative Director, who manages the business of the company, must discharge his duties in good faith.  And the members' liability is limited for "any act[s] performed in good faith," or "any good faith failure or refusal to perform any acts except those required by the terms of this Agreement," provisions which, by logical extension, show that the Members are liable for acts *not* performed in good faith.

31.     Beyond these explicit good faith obligations, the JV Agreement is governed by Korean law, which imposes a statutory duty of trust and good faith on all contractual parties.

32.     The JV Agreement imposes additional duties on the members.  POSCO E&C and Gale Songdo agreed to pay a developer (ultimately, GIK, an entity described below) a development fee for each development project.  This fee is allocated between GIK's members (POSCO E&C and Gale Korea) in proportion to their ownership of GIK's units.  POSCO E&C and Gale Songdo agreed that POSCO E&C could act as a Construction Contractor on Songdo projects, subject to the approval of the Joint Venture's Board of Directors.

33.     The JV Agreement also specified the procedure in the event that either POSCO E&C or Gale Songdo decided to sell (or purchase) the other's interest in the Joint Venture.  The

"Buy/Sell" provision sets a contractual "Buy Price" intended to ensure a purchase that conforms to the market value of the Joint Venture units (based on the Joint Venture's holdings).

34.     POSCO E&C additionally agreed to address the New York-based Gale Songdo from potential taxable "phantom" income in the United States (sometimes referred to as "phantom taxes").   Gale Songdo required this provision because the Joint Venture's loan agreement prohibited distributions on earnings before full loan repayment.  While POSCO E&C realized cash flow from construction profits, Gale Songdo faced the possibility that its Korean development efforts would create significant (but paper) profits that would be taxable in the United States. Article 5.5.11 of the JV Agreement addresses this issue by requiring POSCO E&C to "take into account 'phantom income' tax impacts on [Gale Songdo]" and to "undertake measures to eliminate such impacts."

35.     The JV Agreement defines an event of default to include: (i) a breach of any material obligation; (ii) any act "involving fraud, willful misconduct, or gross negligence," or (iii) impermissible transfers of the Joint Venture's units, defined as any transfer made without the approval of the Board of Directors.

36.     Gale Korea and POSCO E&C separately created Gale International Korea ("GIK") to serve as the Joint Venture's agent handling day-to-day operations.  In this capacity, GIK approved construction costs and contracts, oversaw construction efforts, managed the Joint Venture's assets, paid the Joint Venture's Korean taxes, and handled the sale of the Joint Venture's real estate holdings.  GIK's major decisions on these issues require the Joint Venture's approval. The GIK Operating Agreement (the "GIK Agreement") governs the operations of GIK.  Gale Korea owns 70.1 percent of GIK, and POSCO E&C the remaining 29.9 percent of the equity in GIK.

37.     Like the JV Agreement, the GIK Agreement imposes an explicit good faith obligation on the GIK members.  The Representative Director, in managing and controlling the business affairs of GIK, must discharge his duties in good faith. The GIK Agreement limits members' liability for "any act[s] performed in good faith," or "any good faith failure or refusal to perform any acts except those required by the terms of this Agreement."

38.     The GIK Agreement is also governed by Korean law and, thus, the Korean statutory duty of trust and good faith.

39.     Like the JV Agreement, the GIK Agreement explicitly requires POSCO E&C to "take into account 'phantom income' tax impacts on [Gale Korea]," and to "undertake measures to eliminate such impacts."

40.     An event of default under the GIK Agreement includes: (i) a breach of any material obligation; or (ii) any act involving fraud, willful misconduct, or gross negligence.

41.     A Project Management Services Agreement ("PMSA") memorializes the terms of GIK's relationship with the Joint Venture.  Under the terms of the PMSA, GIK assumes day-to-day responsibility for, *inter alia*, paying all taxes, assessments, debts, obligations, costs, and expenses; preparing budgets and reports; negotiating and administering construction contracts; and coordinating with government agencies.

42.     The chart attached as Exhibit A sets out the relationship between POSCO E&C, Gale Songdo, Gale Korea, the Joint Venture, and GIK.

43.     As that chart reflects, the JV Agreement, the GIK Agreement, and the PMSA establish the overarching framework governing Gale and POSCO E&C's relationship with each other with respect to Songdo.  All three are governed by Korean law; all three impose both express obligations on the parties to act in good faith in their dealings with each other, as well as Korean

statutory good faith duties; and all three agreements include dispute resolution clauses requiring that all disputes, controversies, or claims between the parties be resolved through binding arbitration pursuant to the ICC Rules.

44.     Because Gale Songdo and Gale Korea were both based in New York City, a significant amount of the work was carried out on behalf of the Joint Venture in New York.  For example, an extensive amount of the IBD's design and marketing work was implemented and managed from New York; board meetings were conducted in New York on several occasions; POSCO E&C representatives flew to New York for discussions with Gale representatives; and when the relationship between Gale and POSCO E&C broke down, the parties attempted to negotiate a resolution in New York.

**Funding the Development**

45.     To finance the anticipated $35 billion development of the IBD, the Joint Venture entered into a series of loan facilities.

46.     The Joint Venture initially purchased certain Songdo real estate holdings and financed its development efforts through a USD $90 million loan funded in 2003.  In 2004, the Joint Venture repaid and extended that first loan through a USD $180 million bridge loan.  In 2005, the Joint Venture repaid and extended the bridge loan with a USD $1.5 billion construction finance loan.

47.     In 2007, the Joint Venture executed a $2.5 billion construction loan with Shinhan Bank (the "2007 Shinhan Bank Loan") to fund the acquisition of additional real estate holdings in the IBD and finance the ongoing development efforts in Songdo.

48.      Gale Songdo took the lead in negotiating each of these loans, with the Joint Venture's real estate holdings serving as collateral.

4836-5761-0904.2

49.    The 2007 loan agreement prohibited the Joint Venture from making any dividend or other distribution to its shareholders before repayment.  As noted above, this requirement created a potential problem for the New York-based Gale Songdo, which now faced the possibility of the Joint Venture generating "profits" for U.S. tax purposes, without a corresponding dividend or distribution to cover tax costs.  The Parties included specific provisions in the LLC Agreements that imposed explicit obligations on POSCO E&C to address these potential U.S. phantom income implications.

50.    After years of successful development in the IBD, the passing of the Asian financial crisis, and a change in governing parties, a new conservative Korean government began to question its earlier decision to place prime Korean real estate in the hands of a foreign investor.

51.    In 2008, Incheon's newly-elected Mayor Ahn offered Gale Songdo USD $400 million for its 70.1 percent share of Songdo.  Gale Songdo declined, committed to the project and convinced of its profitability.

52.    Having failed to oust Gale Songdo through a buy-out, the new administration of Incheon withheld the Joint Venture's construction permits.  Without these permits, Gale Songdo could not engage in any development work.  By withholding permits, Incheon effectively rendered valueless Gale Songdo's ownership and development rights.  Incheon demanded that the Joint Venture sell back blocks of land, essentially at cost, to receive the permits necessary to recommence development efforts.

53.    The Joint Venture thus had no choice but to acquiesce to the Incheon's demands and re-sell the land back to the city.  Because the Joint Venture's real estate served as collateral on the 2007 Shinhan Bank Loan, the resale of land to Incheon necessitated a refinancing.

54.     In 2010, POSCO E&C led that refinancing effort.  POSCO E&C represented to Gale Songdo that the lenders required POSCO E&C's partial guarantee to move forward after the forced land sale.  Leveraging its position, POSCO E&C would only provide this guarantee on two conditions.  *First*, POSCO E&C demanded to be the exclusive construction contractor on the lucrative mixed-use and residential development projects moving forward.  *Second*, POSCO E&C demanded managerial control of GIK.

55.     Seeing no other path forward, Gale Songdo and Gale Korea acquiesced.  The terms of the new agreement between Gale and POSCO E&C were initially set forth in a "Basic Agreement," which stated that POSCO E&C would lead discussions with the lenders to restructure the 2007 loan, and that Gale and POSCO E&C would amend the LLC Agreements to increase POSCO E&C's managerial authority.

56.     In August 2011, Gale Songdo, Gale Korea, and POSCO E&C clarified and implemented the Basic Agreement's terms by amending the GIK and JV Agreements.  These Amended LLC Agreements thus superseded the Basic Agreement.  Under the new terms, POSCO E&C appoints the Representative Director and three of the five directors to GIK's Board.  Gale Kore remains the majority owner of GIK.  From this point forward, however, GIK was under POSCO E&C's managerial control and acted as POSCO E&C's agent.

57.     Gale Songdo and POSCO E&C also amended the JV Agreement to give POSCO E&C a functional veto.

58.     Nevertheless, POSCO E&C was not authorized to abuse its new position, as it remained bound by its contractual and statutory obligations under the LLC Agreements.  In addition to the contractual and statutory obligations POSCO E&C owed both Gale Songdo and Gale Korea under the LLC Agreements, the Joint Venture and POSCO E&C entered into a Master

Construction Contract ("MCC"). The MCC: (i) established a formula pegged to construction quality for determining allowable construction costs; and (ii) empowered the Joint Venture to review and comment upon design drawings necessary for project approval and completion, approve all exterior and landscape installations to ensure the aesthetic quality of the project, sign off on all sale contracts, and determine sale prices for units.

59.     In December 2013, the Joint Venture refinanced the remaining development work through a series of six Loan Facility Agreements (the "Loan Facility Agreements") with several lenders. POSCO E&C led the refinancing effort. These six Loan Facility Agreements are referred to separately as the Package 1 through Package 6 Loans, as each separate Loan Facility Agreement relates to the development of a specific package of land.

60.     In connection with the Loan Facility Agreements, POSCO E&C and Gale Songdo entered into the Unit Pledge Agreement with the lenders, by which both POSCO E&C and Gale Songdo pledged their units in the Joint Venture as collateral for the loans.

61.     Under the terms of the Unit Pledge Agreement, in the event of a default of any loan facility, the lenders are entitled to sell the Joint Venture units "at a public or a private sale" but only "upon such terms as the [lenders] may reasonably determine." After any such sale, the lenders must return to the unit holders the surplus proceeds remaining after repaying any outstanding loans.

62.     POSCO E&C provided partial guarantees for the Loan Facility Agreements. Under these agreements, if POSCO E&C repays any of the outstanding loans in full, it acquires the rights of the lenders, including the right to seize and sell the Joint Venture's units.

63.     Over time, the loans associated with Packages 2 and 3 were fully repaid. Packages 5 and 6 were refinanced. After these repayments and refinancing, only the Package 1 and 4 loans remained subject to the Unit Pledge Agreement.

**POSCO E&C Abuses Its Control Over GIK and its Role as Construction Contractor**

64.     As described in greater detail in the ICC request for arbitration, POSCO E&C repeatedly abused its control over GIK and its position as prime contractor for Songdo.

65.     *First*, POSCO E&C overcharged the Joint Venture by hundreds of millions of dollars for construction work — in excess of the construction costs allowed by the MCC and far more than POSCO E&C charged other customers for similar work.  POSCO E&C's internal documents reveal that POSCO E&C's profit rate from its contracts with its own Joint Venture was nearly one-and-a-half times higher than initially projected and more than double its profit rate for projects outside of Songdo.  As independent experts confirmed, these overcharges included excessively high prices for construction materials and electrical work; failure to reduce prices to correspond with changes in design; double counting; and significant overestimations of quantities of materials required for these projects.  Moreover, the quality of POSCO E&C's construction work on these lucrative projects was subpar.

66.     As noted, POSCO E&C was incentivized to maximize its construction profits by overcharging for work and underperforming on quality because, as construction contractor, POSCO E&C received 100 percent of the profits from the construction contracts.  In contrast, as minority owner of the Joint Venture, POSCO E&C received only 29.9 percent of any profits from developed work and real estate sales.

67.     *Second*, the POSCO E&C-led GIK sold Joint Venture real estate assets without Gale's consent and in a manner that served the interests of POSCO E&C, rather than the good of the Joint Venture.  For example, in July 2011, GIK, under the control of POSCO E&C, sold a major development block to the lowest of three bidders.  This decision cost the Joint Venture over USD $7 million.  The winning bidder, while not offering as much for the property itself, promised

POSCO E&C a "preferred" construction contract, paying POSCO E&C 15 percent more for construction work than the other bidders offered.

68.     *Third*, POSCO E&C exploited its control of GIK to divert the Joint Venture's corporate funds.  For example, in June 2015, GIK unilaterally paid $62 million to POSCO E&C from the Joint Venture's excess cash reserves as an "advance" on construction costs.

69.     *Fourth*, POSCO E& C — through GIK — used the Joint Venture's corporate seal (or, "chop") to enter into the above transactions without the Joint Venture's approval.  Under Korean law, a document executed by use of a corporate chop is assumed valid and binding.  By misusing the corporate seal, POSCO E&C fraudulently approved transactions that required the Joint Venture's authorization.

70.     *Fifth*, under POSCO E&C's control, GIK frustrated Gale Korea's attempts to secure development fees owed to Gale Korea.

71.     *Finally*, POSCO E&C failed to address, and instead exacerbated, New York-based Gale Songdo's potential phantom income issues.

**Construction Stops and POSCO E&C Sells a Stake to the Saudi Investment Fund**

72.     In September 2015, POSCO E&C and its parent, POSCO, announced that POSCO Chairman Kwon had sold a 38 percent stake in POSCO E&C to the Saudi Arabian Sovereign Fund ("PIF") for over USD $1 billion.  It appears that PIF believed POSCO E&C owned 100 percent of the real estate, development, and construction rights in the IBD, and the purchase price thus reflected the value of the IBD project.

73.     By this time, development of Songdo was 70 percent complete.  The project, which had been financed at a loss through construction and development loans, had entered the stage where it would become immensely profitable.

74.     But Gale Songdo had discovered POSCO E&C's construction overcharges. Exercising its veto rights, Gale Songdo stopped the Joint Venture from approving any additional construction work until the issue could be resolved and POSCO E&C lived up to its contractual obligations, such as obtaining design approval and providing detailed cost breakdowns.  POSCO E&C flatly refused, which halted development (and dried up POSCO E&C's construction profits).

**The Failed New York Negotiations**

75.     Gale and POSCO E&C agreed to meet in New York City to attempt to negotiate their differences.  Over the course of three days in April 2016, representatives from POSCO E&C, Gale Korea, and Gale Songdo met in Gale Songdo's New York offices.

76.     The New York negotiations culminated with a "Realignment Agreement."  That Agreement required POSCO E&C to make substantial payments to Gale Songdo to acquire control over the Joint Venture's corporate chop.  POSCO E&C materially breached the Realignment Agreement, by failing to make the required payments.  As a result, Gale Songdo refused to cede control of the Joint Venture's chop to POSCO E&C.

**POSCO E&C Seizes Gale Songdo's Units**

77.     With the failure of the Realignment Agreement, POSCO E&C decided simply to seize Gale Songdo's units and assume total control over the lucrative Songdo project.  This maneuver would allow POSCO E&C to reap the immediate benefit of renewed construction projects — and profits — as well as the long-term rewards associated with the development and sale of Songdo real estate.

78.     By December 2016, the Joint Venture had repaid or refinanced the loans for Packages 2, 5, and 6.  The Joint Venture repaid the Package 3 Loan in full in January 2018.  The Joint Venture had the ability to continue making timely payments on the remaining Package 1 and

4 Loans.

79.     To seize the units, POSCO E&C blocked the Joint Venture's attempts to make the Package 1 and 4 payments on time — despite the fact that the interest payments were trivial in comparison to the overall outstanding loans and even though the Joint Venture had funds available for the payments.

80.     POSCO E&C thus engineered defaults on the loan facilities associated with the Package 1 and 4 loans, paid off the balances on those loans as a guarantor, and then purported to assume the lenders' rights under the Unit Pledge Agreement.

81.     The stark contrast between POSCO E&C's conduct with regard to Package 6, which once refinanced was no longer subject to the Unit Pledge Agreement, and Packages 1 and 4, which remained subject to the Unit Pledge Agreement, demonstrates POSCO E&C's utter bad faith.

82.     In the summer of 2017, the dispute between Gale Songdo and POSCO E&C over construction charges led to a delay in the preparation of the Joint Venture's annual audited financials.  When the Joint Venture failed to provide the audited financials to the Package 6 lenders on time, the Package 6 lenders declared a technical default of the Loan Agreement and temporarily denied the Joint Venture the right to transfer available funds from the associated Package 6 bank account to pay the required interest payments. POSCO E&C made the outstanding interest payment, preventing a default.  Shortly thereafter, the Joint Venture delivered the financials, gained access to the account, and reimbursed POSCO E&C.

83.     In short, when there was no putative right to seize and sell Gale Songdo's units, POSCO E&C did not exercise its ability to step into the lender's shoes by paying off the outstanding loan balance when the opportunity arose.  Instead, POSCO E&C simply brought the

loan into compliance.

84.    By contrast, when there was a possibility of seizing Gale Songdo's units, POSCO E&C's actions were of a fundamentally different character.  Specifically, with regard to the Package 1 and 4 loans — which remained subject to the Unit Pledge Agreement — POSCO E&C, improperly thwarted the Joint Venture's ability to make timely payments, despite the availability of funds to do so and the relatively small amount of the payments involved.  This led to a default. POSCO E&C then subrogated the loans (*i.e.*, paid off the full outstanding loan amounts) asserting that it thus assumed the rights of the lenders under the Unit Pledge Agreement.  POSCO E&C used the engineered default to purportedly seize and sell Gale Songdo's units in the Joint Venture.

85.    POSCO E&C's internal documents demonstrate that this was POSCO E&C's plan for some time.  In 2015 — well before even the specter of a default — POSCO E&C sent a memorandum to its parent company, POSCO Group, describing various "action plans" to address its outstanding issues with Gale Songdo, primarily the disputes over construction fees and phantom income.

86.    That memorandum explicitly anticipates the possibility of POSCO E&C seizing the Songdo IBD project "in case we fail to agree with [Gale Songdo] on amicable terms."  POSCO E&C plotted to accomplish this seizure by "***tak[ing] over the equity using a third-party foreign company and conduct the project in coordination with lenders.***"  That is precisely the course of action that POSCO E&C followed.

**POSCO E&C Purports to Sell Gale Songdo's Joint Venture units**

87.    In "seizing" the Joint Venture's units, POSCO E&C specifically targeted only Gale Songdo's units.  POSCO E&C then purported to sell these units to two dubious, recently-created Hong-Kong based companies.

88.     POSCO E&C purported to sell these units — worth over USD $2 billion — for approximately $15 million, a fraction of their true value and approximately the amount of Gale Songdo's initial $15 million capital contribution to the Joint Venture.  POSCO E&C claimed to act as a lender in this transaction.  But a lender would have first looked to the availability of other collateral — that is, the Joint Venture's real estate holdings — before seizing the borrower's units. POSCO E&C did not do so.  And a lender would have seized and sold sufficient units to recover the outstanding loan amounts, regardless of ownership.  POSCO E&C targeted only Gale Songdo's units for the purported sale.

89.     By selling to the Hong Kong companies, POSCO E&C ousted Gale from the IBD project, removed the barrier to securing its inflated construction charges and gained control over the lucrative real estate and development rights in the IBD moving forward.

90.     After the purported seizure and sale, POSCO E&C — now in control of the Joint Venture — could pay the fraudulent construction invoices, which totaled more than USD $300 million.  POSCO E&C also removed the barrier to lucrative new construction work.  Without Gale Songdo's oversight, POSCO E&C can continue its construction overcharges unimpeded.

91.     Further, soon after the alleged sale, POSCO E&C refinanced Packages 1 and 4, using the proceeds to repay itself the subrogated amounts (*i.e.*, made itself whole) and extract additional cash in excess of USD $200 million.

92.     In short, POSCO E&C dramatically improved its cash position and financial outlook, leading to a significant improvement in the value of POSCO E&C's company bonds and credit ratings, and paving the way for a likely future initial public offering or recapitalization.

93.     The supposed sale of Gale Songdo's units marked the culmination of a series of improper acts by POSCO E&C.  The sale was thus intimately connected with POSCO E&C's other

breaches of its contractual and statutory duties under the LLC Agreements. Accordingly, all of POSCO E&C's breaches — up to and including the sale of the Joint Venture units — are subject to the mandatory arbitration provisions of the LLC Agreements.

## LEGAL BACKGROUND

### The New York Convention

94.     "The goal of the [New York] Convention is to promote the enforcement of arbitral agreements in contracts involving international commerce so as to facilitate international business transactions." *David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*, 923 F.2d 245, 250 (2d Cir. 1991).

95.     To effectuate this goal, the Convention provides that "[t]he court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative, or incapable of being performed." 21 U.S.T. 2517 art. II(3).

96.     Section 201 of the FAA provides for the enforcement of the Convention in the U.S. courts. 9 U.S.C. § 201 ("The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 shall be enforced in the United States courts in accordance with this chapter."). Under the FAA, "[a]n arbitration agreement . . . arising out of a legal relationship, whether contractual or not, which is considered as commercial . . . falls under the Convention." *Id.* § 202. A court "may direct that arbitration be held in accordance with [such an] agreement at any place therein provided for, whether that place is within or without the United States." *Id.* § 206.

97.     The adoption of the New York Convention by the United States promotes a "strong federal policy favoring arbitration disputes." *Offshore Expl. and Prod. LLC v. Morgan Stanley Private Bank, N.A.,* 986 F.Supp.2d 308, 314-15 (S.D.N.Y. 2013).   The federal bias in favor of arbitration is particularly strong in the context of international transactions.   *Chelsea Square Textiles Inc. v. Bombay Dyeing & Mfg. Co.*, 189 F.3d 289, 294 (2d Cir. 1999).

98.     Accordingly, "federal policy requires [federal courts] to construe arbitration clauses as broadly as possible," and absent an "express provision excluding a particular grievance from arbitration . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *David L. Threlkeld & Co.*, 923 F.2d at 250-51 (citations omitted).   Consequently, "[a]rbitration should be compelled unless it may be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute." *Id.* at 250 (citation omitted).

99.     Like the United States, Korea is a party to the New York Convention.   Korea similarly broadly defines arbitration agreements to encompass any "agreement between the parties to resolve, by arbitration, all or a part of disputes which may arise in the future in respect of a defined legal relationship, whether contractual or not."   Supreme Court, 2005Da74344, May 31 2007 (S. Kor.).

100.    Like their American counterparts, Korean courts also broadly construe arbitration provisions.   Accordingly, "where a valid arbitration agreement is acknowledged, it is reasonable to assume, in the absence of special circumstances to the contrary, that the parties have agreed to resolve by arbitration all disputes arising from the particular legal relationship between them." *Id.*

## COUNT I

### DECLARATORY JUDGMENT THAT THE ENTIRE DISPUTE BETWEEN THE PARTIES IS SUBJECT TO ARBITRATION

101.    Paragraphs 1 through 100 are incorporated by reference as if fully restated herein.

102.    POSCO E&C and Plaintiffs entered into written agreements to govern the operations and day-to-day management of their jointly-owned LLCs.

103.    The LLC Agreements expressly provide for arbitration in Singapore under the rules of the ICC.

104.    Singapore is a signatory of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

105.    The subject matter of the agreement is commercial.

106.    The agreement is not entirely domestic in scope because POSCO E&C is a Korean company and the commercial relationship has a reasonable relationship to Korea.

107.    A court must enforce an agreement to arbitrate if: (i) there is a written agreement to arbitrate the subject of the dispute; (ii) the agreement provides for arbitration in the territory of a signatory of the Convention; (iii) the agreement arises out of a commercial legal relationship; and (iv) a party to the Agreement is a foreign citizen, and the commercial relationship has a reasonable relationship to a foreign state.   *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Intern., Inc.*, 198 F.3d 88, 92 (2d Cir. 1999) (citing *Ledee v. Ceramiche Ragno*, 684 F.2d 184, 186-87 (1st Cir. 1982)).

108.    All disputes between POSCO E&C and Plaintiffs set out in the Request for Arbitration, including the dispute regarding the purported sale of Gale Songdo's units, must accordingly be submitted to binding arbitration under the ICC Rules.

## COUNT II

### BREACH OF CONTRACT

109.    Paragraphs 1 through 108 are incorporated by reference as if fully restated herein.

110.    Gale believes that all disputes between the Parties are subject to arbitration.  If, however, it is determined that the parties may litigate whether POSCO E&C's improper sale of Gale Songdo's Joint Venture units further breached the Unit Pledge Agreement, Plaintiffs bring this breach of contract action.

111.    The Unit Pledge Agreement constitutes a binding and enforceable contract between POSCO E&C and Gale Songdo.

112.    POSCO E&C breached the Unit Pledge Agreement by selling Gale Songdo's units for a fraction of their market value and failing to return the surplus proceeds remaining after repaying any outstanding loans.

113.     As a direct result of POSCO E&C's breach, Gale Songdo suffered foreseeable damages.

114.    POSCO E&C must pay Gale Songdo the surplus determined based upon a reasonable valuation of the sale of the units.

### PRAYER FOR RELIEF

115.    Wherefore, Plaintiffs pray that this Court enter judgment as follows, ordering that:

(a)    All disputes between POSCO E&C, Gale Songdo, and Gale Korea, including the dispute regarding the improper and unreasonable purported sale of Gale Songdo's units, must be submitted to binding arbitration under the ICC Rules;

(b)    In the alternative, if it is determined that in addition to arbitrating Gale's allegations that POSCO E&C's improper sale of the units violated the JV Agreement, the parties may litigate whether POSCO E&C's actions further breached the Unit Pledge Agreement, POSCO E&C breached the Unit

Pledge Agreement by selling Gale Songdo's units on unreasonable terms and failing to remit any surplus from the sale to Gale Songdo;

(c)    POSCO E&C pay damages to Gale Songdo for the unreasonable purported sale of the Joint Venture's units in an amount to be determined at trial;

(e)    Pre-Judgment interest;

(f)    Attorneys' fees, costs and expenses; and,

(g)    Such other relief as the Court deems just and appropriate.

June 11, 2019                    By: /s/ Kevin Muhlendorf

Kevin Muhlendorf (Bar No. KM1707)
Gregory M. Williams
Tatiana Sainati
WILEY REIN LLP
1776 K Street NW
Washington, DC 20006
gwilliams@wileyrein.com
Phone: (202) 719-7593
Facsimile: (202) 719-7049

*Counsel for Plaintiffs*