# Exhibit 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NSC Investment, LLC and TGC/Korea Operating, LLC | Civil Action No. 19-CV-02498 (JGK) |
| Plaintiffs, | |
| -v- | |
| POSCO Engineering & Construction Co., Ltd., | |
| Defendant. | |

**Expert Legal Report of Professor Keechang Kim**

18 November 2019

1

My name is Keechang Kim, and I submit this Expert Legal Report in this suit (Civil Action No. 19-CV-02498 (JGK)).

## PROFESSIONAL BACKGROUND

1.   I am a Professor of Civil Law at Korea University Law School in Seoul, Republic of Korea.

2.   I studied law at Seoul National University (LL.B., 1985), the University of Chicago Law School (LL.M., 1986) and at Queens' College, Cambridge University (Ph.D., 1994). I taught English Legal History and Civil Law at Queens' College, subsequently at Selwyn College and in the Law Faculty of Cambridge University for 8 years. I began teaching in the Law Faculty of Korea University in 2003. I have been lecturing on the Korean Civil Code dealing with contract, tort and property law. I have published a book on English legal history (published by Cambridge University Press) and I am one of the contributing authors of the *Commentaries on the Civil Code of Korea*. I have published articles in academic journals on guarantor's obligations, contract formation, contract interpretation and measure of damages under Korean law. I have had the experience of sitting as a sole arbitrator or a co-arbitrator in arbitrations conducted in accordance with the Rules of the ICC, HKIAC or the KCAB. I have been an expert witness in a number of ICC arbitrations as well as KCAB arbitrations. My c.v. is enclosed herewith.

3.   I passed the Korean Bar Examination in 1985 and I am qualified to practice law in Korea.

4.   I have not previously worked with either Gale ("Plaintiff" or "Claimant") or POSCO ("Defendant" or "Respondent").

## MANDATE

5.   I have been provided with the Claimants' Request for Arbitration dated 14 March 2019, the Respondent's Answer and Counterclaim dated 27 May 2019, the Claimants' Reply to Respondent's Counterclaim dated 26 July 2019 as well as the exhibits to the foregoing, Plaintiff's Complaint, Defendant's Motion to Dismiss, and the Declaration of Defendant's Korean law expert.

6.   I have also reviewed

(i)  the Amended and Restated New Songdo City Development LLC ("Joint Venture") Agreement between NSC Investment LLC ("Gale Songdo") and POSCO Engineering and Construction ("POSCO") concluded on 19 March 2002 ("2002 JVA");

(ii)  the Amended and Restated Gale International Korea LLC Agreement between TGC/Korea Operating, LLC ("Gale Korea") and POSCO concluded on 12 May 2005;

(iii)  the Re-amended and Restated New Songdo International City Development LLC Agreement ("2011 JVA") and the Re-amended and Restated Gale International Korea LLC Agreement ("2011 GIK Agreement") both of which are dated 5 August 2011;

(iv)  the loan agreements dated 16 December 2013 whereby the Joint Venture borrowed 290 billion KRW ("Package 1 Loan Agreement") and 360 billion KRW ("Package 4 Loan Agreement") with the borrower's real estate offered as collaterals for the loans and where POSCO has contractually defined indemnity claims against the borrower (Joint Venture) in the event of POSCO's voluntary repayment of the loans; and

(v)  the Unit Pledge Agreement dated 18 December 2013 ("Unit Pledge Agreement") whereby Gale Songdo and POSCO provided their respective units in the Joint Venture as collaterals to secure the loans extended to the Joint Venture.

7.  I have been requested to provide my report on Korean law and the Korean court's position relating to:

(i)  When and how subrogation rights may be exercised against a co-guarantor under the Korean law;

(ii)  Liabilities arising from wrongful disposal of collaterals; and

(iii)  Damages under the Korean law.

## EXPERT DECLARATION

8.  I understand that my duty is to provide my independent and impartial opinion and give evidence to assist the Court, and that this duty overrides any obligation to the party by whom

3

I am engaged or the person who has paid or is liable to pay me. I confirm that I have complied and will continue to comply with my duty.

9.  I also confirm my independence from the Parties, their respective legal advisors and the Court in this matter, and I confirm that I have not entered into any arrangement where the amount and/or payment of my fees is in any way dependent on the outcome of the case.

10. I confirm that all matters upon which I have expressed an opinion in this written report are within my area of expertise and that I have exercised reasonable care and skill in order to be accurate and complete in preparing this report.

11. I confirm that the opinions set out in this report are my own, impartial and unbiased opinions which have not been influenced by the pressures of the dispute resolution process or by any party to the arbitration or the proceedings in this court.  I have not, without forming an independent view, included any opinion which has been suggested to me by others, including the lawyers instructing me.

12. I understand that this report will form the evidence I will give under oath or affirmation subject to any correction or qualification I may make.

## BASIS OF OPINION

13. My opinion is based on the following assumptions:

    (i)  Gale Songdo and Gale Korea are entities created by Gale Investments Company, LLC in order to pursue, in partnership with POSCO, the development project in Songdo, located near the Incheon International Airport (the "Songdo Project").

    (ii) In 2002, Gale Songdo and POSCO set up the Joint Venture, which owns the real estate and development rights in Songdo. Gale Songdo held 70.1% of the units in the Joint Venture. POSCO held the remaining 29.9% of the units.

    (iii) In 2004, Gale Korea set up NSC Development Company, LLC to provide Songdo Project related development services for the Joint Venture. In 2005, Gale Korea admitted POSCO as a new member (unit holder) of the development company and

changed the company's name into Gale International Korea, LLC ("GIK"). Gale Korea holds 70.1% of the units in GIK. POSCO holds the remaining 29.9%.

(iv)   Pursuant to 2002 JVA and 2011 JVA, Gale Songdo appointed three out of five directors of the Joint Venture. POSCO appointed the remaining two. The decisions of the Joint Venture's Board of Directors used to be made by simple majority under 2002 JVA. Under 2011 JVA, however, Board decisions require at least 4 directors' votes. POSCO thus began to have a veto power since 2011.[1]

(v)   Prior to 2011, GIK – who handles the Joint Venture's day-to-day development operations – was also under the control of Gale Korea who appointed the majority of directors of GIK. In 2011, however, Gale Korea and POSCO agreed to transfer GIK's managerial control to POSCO. Pursuant to 2011 GIK Agreement, POSCO selects GIK's Representative Director and controls the majority of GIK's Board of Directors.[2]

(vi)   The Project Management Services Agreement ("PMSA") concluded between the Joint Venture and GIK designates GIK as the Joint Venture's exclusive agent for the development related works. Under the PMSA, GIK assumes day-to-day responsibilities for a wide variety of tasks, including – *inter alia* – payment of all taxes, payment of Joint Venture's "debts and other obligations relating to the Project".[3]

(vii)   In exchange for POSCO's veto power in the Joint Venture and the managerial control of GIK as well as POSCO's wide-ranging development related planning, design, construction, marketing and financing decision-making powers exercised through GIK, Gale Songdo obtained certain provisions under 2011 JVA to protect its interests. For example,

---

[1]   2011 JVA, Section 5.5.9.

[2]   2011 GIK Agreement, Sections 5.1, 5.5.1 and 5.5.9.

[3]   PMSA, Article 1, Articles 3 F(1) and 3 F(2).

a.  In the event of a deadlock as defined in Section 11-2.1 of 2011 JVA, POSCO may request and Gale Songdo may accept to vote as requested by POSCO on the condition that Gale Songdo shall be entitled to sell all of its units in the Joint Venture to POSCO at a price (the "Buy-Out Payment") which is based on the "Fair Market Value" as defined in Section 11.4(a) of 2011 JVA.[4]

b.  In the event of a deadlock under the GIK Agreement, the party who is entitled to exercise put option or call option under the GIK Agreement shall also be entitled to sell all of its units or buy all of the other party's units in the Joint Venture at the Fair Market Value as defined in Section 11.4(a) of 2011 JVA.[5]

c.  Gale Songdo and POSCO agreed to ensure that the Joint Venture take measures to eliminate the "phantom income" tax impacts on Gale Songdo[6] provided that such measures do not adversely affect the Company's performance of its obligations under the loan agreements.[7]

(viii)  Both 2011 JVA and 2011 GIK Agreement define an event of default to include (i) a breach of any material obligation under the Agreement; or (ii) any act involving fraud, willful misconduct, or gross negligence.[8]

---

[4]  2011 JVA, Section 11-2.1.

[5]  2011 JVA, Section 11-2.2.

[6]  For example, under the Facility Agreement dated 20 November 2007, the Joint Venture is not permitted to distribute profit before the loans are fully repaid. The profit retained by the Joint Venture, however, might nevertheless be viewed as taxable income (as "phantom income") for Gale Songdo or its affiliates under the US tax law.

[7]  2011 JVA , Section 5.5.11.

[8]  2011 JVA , Section 11.2; 2011 GIK Agreement, Section 11.2.

(ix)    Section 3.8 of 2011 JVA stipulates that the parties (Gale Songdo and POSCO) anticipate that the Songdo Project would be pursued using third-party financing "in the maximum amount available on commercially reasonable terms" and the parties further agreed to "cooperate on behalf of the Company and use commercially reasonable efforts, in good faith, to obtain the Loans" for the Songdo Project.

**The 2013 Loans**

(x)     The Joint Venture accordingly funded its Songdo Project through a series of loan facilities. In 2013, in particular, the Joint Venture concluded a series of six loan agreements with several lenders, known as Packages 1 to 6 Loans. Each loan agreement related to a specific package of land being developed by the Joint Venture.

(xi)    In the event the Joint Venture fails to pay the principal and interest of the loans on time, these loan agreements provide that the Joint Venture is "automatically . . . in default without notification, demand for performance or provision of a certain grace period … and all outstanding principal, interests, expenses incurred or other liabilities under th[e] Agreement shall be in Acceleration."  An Acceleration, in turn, triggers an immediate obligation for the Joint Venture to repay to the lenders "all outstanding debts" including "the Principal and Interest of [the] Loan . . . without a notification or demand for performance."[9]

(xii)   POSCO warranted to the lenders that there is no event of default in relation to the loans (Package 1 Loans) and agreed with the lenders to ensure that no event of default occurs (Package 4 Loans).[10] POSCO also acquired contractually defined indemnity claims against the Joint Venture which arise if POSCO voluntarily repays the Joint Venture's loans. Upon POSCO's repayment of loans, (1) the Joint Venture's indemnity

---

[9]    See, *e.g.*, Section 10-2(2) of Package 1 Loan Agreement.

[10]   See, respectively, Sections 7-1 and 7-11 of Package 1 Loan Agreement and Section 7-3(6) of Package 4 Loan Agreement.

7

obligations to POSCO shall be deemed to fall due on the day of POSCO's repayment to the lenders and, (2) upon POSCO's full repayment of the Joint Venture's obligations to the lenders, POSCO shall subrogate the lenders' rights and authorities pursuant to the Financing Agreements.[11]

(xiii)   In addition, the Joint Venture, Gale Songdo and POSCO each offered 'real' security (collaterals) for the loans. First, the Joint Venture offered the land to be developed as security for the loans.[12] Second, POSCO and Gale Songdo pledged their units in the Joint Venture as additional collaterals pursuant to the Unit Pledge Agreement dated 18 December 2013.

(xiv)   The Unit Pledge Agreement secures the Joint Venture's obligations to the lenders which are defined in the Unit Pledge Agreement as "Secured Obligations". In the event of an Acceleration under any of the loan agreements referenced in the Unit Pledge Agreement, the lenders (as the Pledgees) can "assign, sell, or otherwise dispose of the [Pledgors'] Units . . . at a public or a private sale, and upon such terms as the Pledgees may reasonably determine" and that the lenders "incur no liability as a result of the sale of the Units or any part thereof, at any private sale pursuant to Section 6.1 hereof." The Pledgors further agreed to waive "any claims against any Pledgee arising by reason of the fact that the price at which the Units have been sold at such private sale may be less than the price at which it could have been sold otherwise."[13]

**The Loan Defaults**

(xv)   By 2017, the Joint Venture had repaid the Package 2 Loan and refinanced Packages 5 and 6 Loans. The refinanced Packages 5 and 6 Loans were no longer subject to the Unit Pledge Agreement.  By 2018, the Joint Venture repaid the Package 3 Loan.

---

[11]   Section 12-3 of Package 1 Loan Agreement, Section 13-4 of Package 4 Loan Agreement.

[12]   See, *e.g.*, Section 5-1(1) of Package 1 Loan Agreement.

[13]   Sections 6.1(c) and 6.3 of Unit Pledge Agreement.

(xvi)    Between June 2016 and June 2017, Gale Songdo sought to ensure that the Joint Venture
        paid interests on Package 4 Loans to prevent a default. POSCO initially agreed but
        subsequently changed its position. Due to POSCO's opposition, neither GIK nor the
        Joint Venture could take the decision to make interest payment for Package 4 Loans
        even though the Joint Venture had sufficient funds to do so. POSCO also refused Gale
        Songdo's request that the Joint Venture should refinance Package 4 Loans.

(xvii)   On 22 June 2017, Package 4 Loans went into default. On 23 June 2017, POSCO fully
        repaid the loans (360 billion KRW) on behalf of the Joint Venture. POSCO thus
        acquired the contractually agreed indemnity claims against the Joint Venture as well as
        the subrogation rights pursuant to Section 13-4 of Package 4 Loan Agreement.

(xviii)  Package 1 Loans' maturity date was 18 December 2017. Prior to the maturity date,
        Gale Songdo sought to ensure that the Joint Venture refinance Package 1 Loans.
        POSCO opposed. Due to POSCO's opposition, neither GIK nor the Joint Venture could
        take the decision to refinance Package 1 Loans.

(xix)    On 18 December 2017, upon maturity of Package 1 Loans, POSCO fully repaid the
        remaining balance of Package 1 Loans (130.08 billion KRW). POSCO thus acquired
        the contractually agreed indemnity claims against the Joint Venture as well as the
        subrogation rights pursuant to Section 12-3 of Package 1 Loan Agreement.

**POSCO's indemnity claims against the Joint Venture**

(xx)     Gale Songdo sought to ensure that the Joint Venture pay POSCO's contractual
        indemnity claims against the Joint Venture which arose on 23 June 2017 (regarding
        Package 4 Loans) and on 18 December 2017 (regarding the balance of Package 1
        Loans) with available funds. POSCO opposed. Due to POSCO's opposition, neither
        GIK nor the Joint Venture could take the decision to pay contractual indemnity claims
        of POSCO.

(xxi)    Sometime in November 2017, POSCO purported to exercise its subrogation right under
        Package 4 Loan Agreement and sold some of the Joint Venture's properties (plot "B2")

without going through the Joint Venture's decision making process. POSCO is believed to have received 230 billion KRW from the sale of the Joint Venture's land.

**POSCO's contribution claims against Gale Songdo**

(xxii)    Since POSCO's repayment of the loans on behalf of the Joint Venture, while the parties have discussed and negotiated whether the Joint Venture should repay POSCO's indemnity claims, POSCO has not demanded Gale Songdo's contribution towards the amount POSCO repaid to the lenders. POSCO has not presented or specified the amount of Gale Songdo's portion of contribution owed to POSCO in respect of POSCO's repayment of the loans.

(xxiii)   Sometime in September 2018, POSCO purported to exercise its subrogation right against Gale Songdo and sold Gale Songdo's 70.1% unitholding in the Joint Venture in a private sale to certain entities at a price believed to be about 17 billion KRW.

(xxiv)    On 14 March 2019, Gale Songdo and Gale Korea filed the Request for Arbitration against POSCO.

(xxv)     On [date], Plaintiff filed this current suit.

## OPINION

14.   I provide my opinion on whether, in addition to any alleged violations of the 2011 JVA, POSCO breached its duties under the Unit Pledge Agreement and Korean law assuming that POSCO sold only Gale Songdo's Joint Venture units (Section I of this Report).  I shall also discuss whether, assuming that POSCO had acquired the lenders' rights under the Unit Pledge Agreement, POSCO impermissibly exercised those rights because POSCO never made proper demand for contribution from Gale Songdo (Section II of this Report). In Section III of this Report, I provide my opinion on whether POSCO violated the Unit Pledge Agreement and Korean law assuming that the sale of Gale Songdo's Joint Venture units was for an unreasonably low value.

15.   Although the focus of my opinion is on the Unit Pledge Agreement, it is important to note that the 2011 JVA and the Unit Pledge Agreement are closely interrelated and, thus, the Unit

Pledge Agreement cannot properly be interpreted or applied independently from the parties' contractual relationship founded on the 2011 JVA.  In addition, conduct that breaches one of these agreements may also constitute a breach of the other.

## I. Continued Ownership of Membership Interests in the Joint Venture

16.  Section 1.1 of 2011 JVA stipulates that the purpose of the agreement is "to provide for the continuation, ownership and operation by the Members of the Company as a Korean limited liability company". The importance of the parties' continued ownership of membership interests in the Joint Venture is further underscored in Section 7.1.1 of 2011 JVA, which – in the relevant part – stipulates as follows (emphasis added):

> Unless approved by Special Resolution at a General Meeting of Members, except as provided in this Article VII, no Member shall sell, assign, transfer, pledge, charge or otherwise encumber, or suffer any Third Party to sell, assign, transfer, pledge, charge or otherwise encumber, or contract to do or permit any of the foregoing, directly or indirectly and whether voluntarily or by operation by law (collectively referred to as a "Transfer") any part or all of its interest or membership in the Company.

17.  The parties thus agreed that they would not (unless approved by Special Resolution at a General Meeting of Members which requires the consent of the Members holding 75% or more of the units) sell or pledge their membership interests nor suffer any third party (such as a lender who may have a security right) to sell or to transfer their membership interests.

18.  Of course, the parties may consent to the transfer (which includes pledging) of membership interests. They agreed, for example, to pledge their units to secure the Joint Venture's loan obligations which are enumerated in the Unit Pledge Agreement as the "Secured Obligations". The parties warranted that the execution and performance of the Unit Pledge Agreement are not in conflict with any agreement (such as 2011 JVA) which binds them.[14] Exhibit G (Member Decisions) of 2011 JVA stipulates (in item 15) that a transfer (which includes pledging) by a Member of its units to a non-Member (such as the lenders or third party purchasers) requires Special Resolution of General Meeting of Members. I assume that the

---

[14]   Unit Pledge Agreement, Section 3(h).

parties' decision to pledge their units to the lenders to secure those "Secured Obligations" of the Joint Venture was duly approved by Special Resolution at a General Meeting of Members of the Joint Venture. In any event, it was agreed upon by all Members of the Joint Venture.

19. But it is important to note further that the parties also agreed that they "shall maintain their unitholding of 100% of the total issued and outstanding units of the [Joint Venture] throughout the term of this Agreement" (Section 4.4 of Unit Pledge Agreement). The term of the Unit Pledge Agreement shall continue until the Secured Obligations are fully repaid (Section 9 of Unit Pledge Agreement) or, if the repayment is done by a non-borrower (such as POSCO, Gale Songdo or any other entity who has legitimate interest in repaying the loans), the term of the Unit Pledge Agreement would further extend while such payer or those who contributed to the payment are entitled to exercise their subrogation rights.[15]

20. In other words, although the parties to 2011 JVA agreed to pledge their units (they thus assumed the risk that their units may be 'involuntarily' sold or transferred upon Joint Venture's failure to discharge the Secured Obligations), they have not agreed to suffer their units to be 'split' so that less than 100% of the units are sold to a third party. Until the Secured Obligations are fully repaid by the borrower or (in the event of a non-borrower's repayment of the loans) as long as those who repaid or contributed to the repayment are entitled to exercise the subrogation rights, Gale Songdo and POSCO are contractually bound to maintain their unitholding of 100% of the Joint Venture.

21. The lenders, it is true, have no *contractual* obligation to ensure that 100% (and no less than 100%) of the units in the Joint Venture are sold when they exercise their right as the Pledgees under the Unit Pledge Agreement. But reasonable lenders would normally choose to do so because that is to their advantage. An attempt to sell less than 100% of units of a closed company to an outsider is bound to encounter difficulties. It would make little sense for the

---

[15]   If the loans are fully repaid by the borrower, any pledge agreement securing the loans will fully terminate. If, however, the loans are repaid by a non-borrower, the pledge agreement subsists – by operation of law – to the extent necessary to allow the exercise of subrogation rights.

lenders to attempt to do so when they are entitled to sell 100% of the units of the Joint Venture.

22. Moreover, the lenders – as the pledgees – have a *statutory* duty of care expected of a good manager (*bonus paterfamilias*) to preserve the value of the collaterals entrusted to them (100% of the Joint Venture's units).[16] If the lenders (or any person who exercises the lenders' rights by virtue of subrogation) arbitrarily choose to 'break up' a closed company's unitholding and sell only a split portion to a third party, the overall commercial worth of the company will most probably be substantially degraded. If the lenders (or any person subrogating the lenders) nevertheless choose to do so, they open themselves up to a very substantial risk of violating their *statutory* duty of care to maintain the commercial value of the collaterals. Assuming that 100% interests in the Joint Venture could have been sold at the price of 100, a decision to sell 70% interests at a price less than 70 would be harming the overall worth of the collaterals (unless there is a way to ensure that the remaining 30% interests in the Joint Venture can be sold at a price higher than 30).

23. It would therefore be more reasonable to interpret that while Gale Songdo and POSCO are *contractually* bound to maintain 100% unitholding in the Joint Venture, the lenders (or any person who subrogates the lenders) are bound by their *statutory* duty of care to preserve the worth of the collaterals entrusted to them (100% units of the Joint Venture) so that in the event the collaterals (units) have to be sold, the sale can achieve the best possible sale proceeds by transferring 100% (and no less than 100%) interests of the Joint Venture to the purchaser.

24. If POSCO, in its purported exercise of subrogation right, causes or suffers less than 100% of the units in the Joint Venture to be sold to a third party, I am of the view that POSCO is in

---

[16] Article 324 of the Korean Civil Code (lien holder's duty of care) applies *mutatis mutandis* to a pledgee who must take good care of the collaterals which are entrusted to him. See Article 343 of the Korean Civil Code.

violation of Section 7.1.1 of 2011 JVA and section 4.4 of the Unit Pledge Agreement. The reasons are as follows:

(i)     POSCO is not released from its contractual obligations under 2011 JVA merely because it acquired subrogation rights exercisable against the Joint Venture or against co-guarantors of the Joint Venture's debts. While the lenders may exercise their security rights without being bound by 2011 JVA, POSCO can only exercise its subrogation rights subject, at all times, to its obligation under Section 7.1.1 of 2011 JVA as well as Section 4.4 of the Unit Pledge Agreement.

(ii)    If POSCO, in its exercise of subrogation rights, had chosen to sell 100% of the units of the Joint Venture, such a transfer (of 100% of the units) would not be in violation of Section 7.1.1 of 2011 JVA or Section 4.4 of the Unit Pledge Agreement because the risk of 100% units being sold by the lenders or by a person who may subrogate the lenders was already contemplated by the parties and approved by all of the Members of the Joint Venture.

(iii)   A transfer of less than 100% of the units of the Joint Venture, if it was done by the lenders or by a payer who is not a party to 2011 JVA, would not be a violation of 2011 JVA (because they are not bound by 2011 JVA). But if such a transfer was effected by POSCO or by Gale Songdo, it would be in violation of Section 4.4 of the Unit Pldedge Agreement and Section 7.1.1 of 2011 JVA because such a transfer (of less than 100% interests in the Joint Venture) was neither contemplated by the parties (Gale Songdo and POSCO) when they concluded the Unit Pledge Agreement (in fact, they agreed the opposite, i.e., to maintain their 100% unitholding in the Joint Venture as long as the Unit Pledge Agreement subsists) nor approved by Special Resolution at a General Meeting of Members of the Joint Venture pursuant to Section 7.1.1 of 2011 JVA. It would be unreasonable to suppose that POSCO or Gale Songdo would have, at the time they pledged their units and expressly agreed to maintain 100% unitholding in the Joint Venture, contemplated and approved that one of them could peremptorily sell the other's units and break up their Joint Venture relationship.

25. If the transfer of a portion (less than 100%) of the unitholding in the Joint Venture to a third party diminishes the overall worth of the Joint Venture, POSCO (who exercised the lenders' right to do so) shall also be in violation of the *statutory* duty of care expected of a good manager which applies to the lenders (and to any person, such as POSCO, who subrogates the lenders).

## II. Contribution claim and subrogation right against a co-guarantor

26. While POSCO acquired – upon its repayment of the Joint Venture's loans – contractually agreed indemnity claims against the Joint Venture pursuant to Section 12-3 of Package 1 Loan Agreement and Section 13-4 of Package 4 Loan Agreement, POSCO acquired no such indemnity claims against Gale Songdo. POSCO only acquired statutory contribution claims against Gale Songdo, who is one of the co-guarantors of the Joint Venture's borrowings. There are important differences between POSCO's contractual indemnity claims against the Joint Venture and POSCO's statutory contribution claims against Gale Songdo.

### (1) POSCO's contribution claim against Gale Songdo

27. While POSCO's contractual indemnity claims against the Joint Venture include the *full* amount of POSCO's repayment of the loans as well as the default interest (19% or 15% p.a.) from the date following the date of POSCO's repayment of the loans, POSCO's statutory contribution claim against Gale Songdo is limited to a *portion* of the *actual amount paid* to the lenders (plus statutory rate of interest thereon[17]) rather than the full amount *claimable* from the Joint Venture as contractual indemnity claims. The precise amount of POSCO's statutory contribution claim against Gale Songdo shall be determined in accordance with Article 482 of Korean Civil Code.

Principal sum

---

[17]   On the topic of interest, see the discussion in Paras. 36-39 below.

28. I understand that the Joint Venture's obligations to the lenders under the relevant loan agreements were

    (i)    secured by the Joint Venture, Gale Songdo and POSCO who each provided their respective, relevant assets as collaterals for the loans; and

    (ii)    guaranteed by POSCO who expressly agreed with the lenders to ensure or to warrant that no event of default occurs under the relevant loan agreements.

29. Although Section 12-3(1) of Package 1 Loan Agreement and Section 13-4(30) of Package 4 Loan Agreement state that POSCO "shall not have any obligation in respect of the Loan Obligation", these same Agreements also stipulate that POSCO (together with the borrower) warrants that there is "no Event of Default in relation to the Loan" and that POSCO "shall ensure that no Event of Default … occurs".[18] These contractual provisions should be harmoniously interpreted to mean that although POSCO has no obligation to repay the loans as the primary obligor of the loans, POSCO shall be held liable in the event of the Joint Venture's (the primary obligor's) default. Assuming that is the case, under the Korean law, such obligation of POSCO is a guarantor's obligation, which is conceptually distinct from the borrower's primary obligation.[19] If POSCO had also been a *primary obligor* of the loans together with the Joint Venture, POSCO's repayment of the loans would not give rise to any subrogation rights for POSCO. Upon repayment of debts by a primary obligor, guarantors and collateral providers shall be definitively released. The primary obligor may not have any subrogation rights against guarantors or collateral providers.

30. Pursuant to Article 482 of the Korean Civil Code, if a person who is not the primary obligor of a debt repays and discharges the debt, the person (the payer of the debt) shall acquire the right to demand contribution from guarantors and collateral providers. The payer shall also be entitled to subrogate the creditor to exercise the creditor's rights (including security rights) to

---

[18]   Sections 7-1 and 7-11 of Package 1 Loan Agreement and Section 7-3(6) of Package 4 Loan Agreement.

[19]   Article 428 of the Korean Civil Code.

the extent necessary to satisfy the contribution claims exercisable against those who must contribute.

31. Article 482(2)(v), in particular, stipulates that where there are one or more collateral providers (whose guarantee obligations are limited to the value of their collaterals) and one or more guarantors (whose guarantee obligation is unlimited), the payer's contribution claims must be apportioned,

   (i)   first of all, by equally dividing up the total reimbursement amount on the basis of the number (i.e., head-count) of the collateral provider(s) and guarantor(s). The guarantor(s) with unlimited exposure must each contribute to the equally divided up portion (and no more) of the payer's reimbursement claim.

   (ii)   Secondly, amongst the collateral providers, the amount of their respective contribution obligation must be determined in proportion to the worth of their respective collaterals.

32. Assuming, for example, that POSCO paid 130.08 billion KRW to the lenders in full satisfaction of the remaining balance of Package 1 Loans on 18 December 2017, POSCO's statutory contribution claim exercisable against Gale Songdo must be determined as follows:

   (i)   First of all, the amount that ultimately needs to be reimbursed (130.08 billion KRW plus the statutory rate of interest) must be divided into 3 equal parts because there are three collateral providers (the Joint Venture, Gale Songdo and POSCO) with limited exposure[20] and one guarantor (POSCO) with unlimited exposure and also because if one person is both a collateral provider and a guarantor, that person shall count as one guarantor with unlimited exposure.[21] The Joint Venture's and Gale Songdo's combined

---

[20]   As the provider of collaterals, the Joint Venture's exposure is limited to the worth of the collaterals. But, as the *borrower* of the loans, the Joint Venture of course has the ultimate and unlimited responsibility and exposure.

[21]   Supreme Court Judgment 2007Da61113, dated 10 June 2010.

contribution obligation (as collateral providers) shall be 86.82 billion KRW, which is 2/3 of 130.08 billion KRW.[22]

(ii)   Second, amongst the collateral providers, their respective contribution obligation must be determined proportionately to the worth of their respective collaterals. I have been requested to assume, without prejudice, that the collaterals provided by the Joint Venture to secure Package 1 Loans (Package 1 land) are worth approximately 5% of the fair market value of the Joint Venture. Assuming that the collaterals provided by Gale Songdo are worth 70.1% of the fair market value of the Joint Venture, the statutory contribution obligation of Gale Songdo shall be 81.03 billion KRW, which is about 93.3% of 86.82 billion KRW.

33.   Regarding Package 4 Loans, I understand that POSCO fully repaid 360 billion KRW on 23 June 2017 and that POSCO exercised its contractual indemnity claim against the borrower and received about 230 billion KRW from the sale of some of the borrower's properties (plot "B2") in November 2017. After the sale of plot "B2", the amount which still remained to be reimbursed to POSCO was therefore about 130 billion KRW.

34.   POSCO's statutory contribution claim exercisable against Gale Songdo (in respect of about 130 billion KRW which remained to be reimbursed) must be determined in accordance with the rules explained above. The total amount for reimbursement must first of all be divided up into three equal portions. The combined contribution obligation of the collateral providers is

---

[22]   Of course, the Joint Venture in the present case also has the contractual indemnity obligations (in respect of the entirety of POSCO's repayment plus contractually agreed default interest, etc.) which are separate from its statutory contribution obligation to POSCO as a collateral provider. In any case, the primary debtor (the borrower) always has the ultimate reimbursement obligation for the entire amount of a debt if the debt is discharged by one or more non-borrowers. But, the primary debtor's ultimate reimbursement obligation is distinct from the its statutory contribution obligation which arises only when the primary debtor happens also to be a collateral provider.

about 86.66 billion KRW, which is 2/3 of 130 billion KRW. This amount must then be broken down proportionately to the worth of their respective collaterals. I have been requested to assume, without prejudice, that the collaterals provided by the Joint Venture to secure Package 4 Loans (prior to the sale of B2) were worth approximately 15% of the Joint Venture's fair market value. Assuming Gale Songdo's collaterals are worth 70.1% of the Joint Venture, Gale Songdo's statutory contribution obligation as a collateral provider shall be 71.38 billion KRW, which is about 82.37% of 86.66 billion KRW.

35. Based on the above assumptions and calculations regarding the *principal* sum to be reimbursed to POSCO, I am of the view that Gale Songdo's statutory contribution obligation was 152.41 billion KRW in total (i.e., 81.03 billion KRW + 71.38 billion KRW, assuming that the Joint Venture's respective collaterals were worth as I am requested to assume).

<u>Interest</u>

36. I understand that POSCO fully repaid the loans early enough (on the day of Package 1 Loans' maturity or on the day immediately following the date of Package 4 Loans' default) so that no default interest was payable to the lenders. Thus, neither of the guarantors nor the borrower had to pay any default interest to the lenders.

37. Although the Joint Venture was nevertheless liable to pay the default interest to POSCO pursuant to the separate indemnity agreements between POSCO and the Joint Venture[23], Gale Songdo is not a party to such agreements. Nor did Gale Songdo agree to secure the Joint Venture's contractual indemnity obligations to POSCO (which include the default interest).

38. Under the Unit Pledge Agreement, Gale Songdo and POSCO only agreed to secure the Joint Venture's loan obligations <u>payable to the Lenders</u> ("Secured Obligations"). The Joint Venture's contractual indemnity obligations payable to POSCO (which are separate obligations distinct from the loan obligations to the lenders) are not secured by Gale Songdo or by any party to the Unit Pledge Agreement.

---

[23]   See Para. 25 above.

39. Upon full repayment of the loans by a non-borrower (such as POSCO) which extinguishes the Secured Obligations, Gale Songdo only has the *statutory* obligation to answer to the contribution claims of the payer (non-borrower) who discharged the loans on behalf of the borrower. The method of apportioning the payer's contribution claims among co-guarantors and collateral providers has been explained above. In my view, Gale Songdo's liability to pay interest to POSCO shall only be in respect of Gale Songdo's statutory contribution obligation, whose principal sum was about 152.41 billion KRW in total. The applicable rate of interest is 6% p.a. statutory rate of interest (Article 54 of Korean Commercial Code).[24]

## (2) The due date of Gale Songdo's contribution obligation

40. Unlike the Joint Venture's contractual indemnity obligations to POSCO (whose due date was agreed upon by the Joint Venture and POSCO[25]), Gale Songdo's statutory obligation to contribute towards POSCO's repayment has no (agreed) due date. Gale Songdo's contribution obligation to POSCO is not based on any contract. Although POSCO and the Joint Venture concluded an indemnity agreement between them, there is no contribution agreement between Gale Songdo and POSCO.

---

[24] Supreme Court Judgment 2005Da32418, dated 26 February 2009 where the Court ruled that an agreement on interest concluded between the principal debtor and the person who repaid the debt shall not be applicable when the payer of the debt exercises the statutory subrogation rights pursuant to the relevant Civil Code provisions. Also see Won Lim Jee, *Principles of Civil Law* (2017), p. 415 ("지연이자나 대위변제자가 입은 손해를 변제자대위에 의해서는 배상받을 수 없지만[...], 내부관계에 기한 구상에서는 지연이자나 손해가 전보될 수 있다." "Default interest or the loss sustained by the payer of the debt shall not be recoverable through an exercise of subrogation rights. But they may be recoverable through a reimbursement claim depending on the contractual relationship between the payer and the debtor.")

[25] The JV and POSCO agreed that the JV's indemnity obligations fall due on the date POSCO repays the JV's debts. Section 12-3(2) of Package 1 Loan Agreement and Section 13-4(31) of Package 4 Loan Agreement

41.  In the absence of a contract stipulating the terms of a guarantor's or collateral provider's contribution obligation in the event of a non-borrower's repayment of the debt, the statutory obligation such as Gale Songdo's contribution obligation is, under the Korean law, generally understood as an obligation to disgorge unjust benefit.[26] The rationale is that where a non-borrower discharges the borrower's debt, a guarantor or a collateral provider who does not contribute its fair share to the non-borrower's repayment is deemed to enjoy unjust benefit from the non-borrower's payment which extinguishes the borrower's obligations as well as the co-extensive obligations of the guarantor and the collateral provider. An obligation to disgorge unjust benefit has no (agreed) due date.[27]

42.  Article 387(2) of the Korean Civil Code stipulates as follows:

_____

[26]  *Commentaries to the Civil Code*, General Part on Obligations, Vol. 4, 4th ed. (2014), p. 341 (구상권의 발생원인으로는 수임인·사무관리자의 비용상환청구권(688조, 739 조), 부당이득반환청구권(748조) 등이 있고). Won Lim Jee, *Textboot on Civil Law*, 16th edn. (2018), p. 973 ("사무관리의 요건이 충족되지 않으면 부당이득법에 따른 반환청구(제748조)로서 구상권을 취득한다"). Also see Supreme Court Judgment 95Da47176, dated 9 February 1996 where the Court explains that a guarantor (who guaranteed a tortfeasor's liability to pay damage) shall, upon discharging the liability, have a contribution claim against the co-tortfeasor to the extent of the latter's share of the damage liability. The Court explained that the contribution claim is in the nature of a demand to disgorge unjust benefit.

[27]  See, for example, Supreme Court Judgment 2007Da8914, dated 1 February 2008 (the Court ruled that an obligation to disgorge unjust benefit from possessing another person's land is an obligation which has no due date and that the obligor shall not be in default until the obligee makes a valid demand for payment). Won Lim Jee, *Textbook on Civil Law*, 16th edn. (2018), p. 1666 also explains that an obligation to disgorge unjust benefit does not fall in default until the obligee makes a demand for payment.

In the case of an obligation without a due date, the obligor shall be liable for default from the moment the obligee makes the demand of performance.

43. While the obligee does not demand the performance, the obligor whose obligation is without a due date shall not be in default. Also, where the obligee makes a demand which is excessive, the Korean Supreme Court would rule that the demand is invalid (thus the obligor is not in default) provided that the obligee is not prepared to accept the performance which falls short of the demanded amount. For instance, where the demand for payment was about 10% more than the correct amount of the obligation, the Supreme Court ruled that the demand was invalid (hence, the obligor was not in default) because the obligee was not prepared to accept the correct (smaller) amount of payment as valid performance.[28] Also, where the demand was more than double the correct amount, the Supreme Court ruled that the demand was invalid and the obligor was therefore not in default.[29]

44. I understand that while the parties discussed and negotiated whether the Joint Venture must pay POSCO's contractual indemnity claims, POSCO has not demanded Gale Songdo to make statutory contribution (i.e., to pay an *appropriate portion* of POSCO's repayment of the debts). Even if POSCO demanded Gale Songdo to make payment to POSCO, if the demanded amount is excessive and if it is clear that POSCO was not prepared to accept the correct amount (about 152.41 billion KRW plus interest at 6% p.a.) as valid performance, the Tribunal or the Court should conclude that a valid demand for contribution was not made and that Gale Songdo's statutory contribution obligation to POSCO was not in default.

45. If POSCO had made a valid demand for Gale Songdo's contribution in the correct amount, Gale Songdo could have an opportunity to contribute and may well have decided to do so. This is all the more likely because, if Gale Songdo contributes (i.e., voluntarily pays) upon POSCO's valid demand to contribute, Gale Songdo shall also be entitled to subrogate the

---

[28] Supreme Court Judgment 91Da38723, dated 24 July 1992; Supreme Court Judgment 89Daka34022, dated 26 June 1990.

[29] Supreme Court Judgment 2004Da13083, dated 9 July 2004.

22

lenders' rights together with POSCO.  POSCO and Gale Songdo must then jointly exercise their subrogation rights against the Joint Venture in proportion to their respective amounts of contributions.[30]

### (3) POSCO's purported exercise of subrogation right against Gale Songdo

46. Assuming that POSCO has not made a valid demand for contribution, Gale Songdo's contribution obligation is not in default. In that case, POSCO may not exercise the subrogation right to dispose of the collaterals. Only when Gale Songdo has been served with a valid demand to contribute and fails to do so, will the contribution obligation of Gale Songdo be in default and POSCO shall then be entitled to exercise the subrogation right to satisfy its contribution claims.[31]

47. It is an undisputed point of Korean law that a security right (such as pledge) can only be exercised when the obligation secured by it is in default. For example, if a bank forecloses on the borrower's mortgaged house while the borrower's obligation is not even in default, the foreclosure shall be a wrongful breach of contract as well as a tort. Likewise, if the pledgee, or any person who purports to subrogate the pledgee's right, disposes of the pledged collaterals even before the obligation secured by the collaterals[32] is in default, the disposal shall constitute a wrongful breach of contract as well as a tort because the premature disposal of collaterals amounts to a tortious interference with other person's properties.

---

[30]   Supreme Court Judgment 2010Da11651, dated 14 June 2012.

[31]   Won Lim Jee, *Textbook on Civil Law*, 16th ed. (2018), p. 759 ("In order to exercise the right of pledge, the obligor's obligation must be in default.")

[32]   POSCO's and Gale Songdo's units used to secure the Secured Obligations as defined in the Unit Pledge Agreement. However, once the Secured Obligations have been discharged by POSCO (i.e., a non-borrower), Gale Songdo's pledged collaterals were only securing the non-borrower/payer's statutory contribution claims against Gale Songdo.

48. POSCO agreed with the Joint Venture that the latter's indemnity obligation to the former shall fall due on the date of the former's repayment to the lenders. POSCO further agreed with the Joint Venture that if the contractual indemnity obligation is not discharged on the due date, the Joint Venture shall be in default.[33] But Gale Songdo is not a party to the agreement. POSCO may not claim that an agreement between the Joint Venture and POSCO shall bind Gale Songdo who neither agreed to indemnify POSCO nor agreed to provide any collaterals to secure the Joint Venture's contractual indemnity obligations to POSCO. An agreement among the lenders, POSCO and Joint Venture is not capable of *increasing* the statutory contribution obligation of Gale Songdo who is not a party to the agreement.[34] Gale Songdo and POSCO agreed to secure the Joint Venture's loan obligations to the lenders. Neither of them agreed to secure the Joint Venture's indemnity obligations to POSCO. Vis-à-vis Gale Songdo, POSCO only acquired the subrogation rights recognised in law (rather than by any contract between them). Against Gale Songdo's collaterals, POSCO is only statutorily entitled to exercise the lenders' rights in a limited scope (to the extent necessary to satisfy its statutorily recognised contribution claims) only when Gale Songdo's *statutory* contribution obligation is in default.

49. Assuming that POSCO has not made a valid demand to Gale Songdo to contribute in the correct amount, the Tribunal or the Court should conclude that Gale Songdo was not in default of its statutory contribution obligation and that POSCO's purported exercise of subrogation right against Gale Songdo is a wrongful breach of contract (*i.e.*, the Unit Pledge Agreement) as well as a tort (even if the disposal of Gale Songdo's units was done at a reasonable price).

### III. Liabilities for selling the collaterals at an unreasonable price

50. Even where all requirements are met for POSCO to exercise the subrogation rights to ensure/enforce Gale Songdo's contribution obligation (i.e., even when a valid demand to

---

[33] Section 12-3(2) of Package 1 Loan Agreement and Section 13-4(31) of Package 4 Loan Agreement.

[34] *Commentaries to the Civil Code*, General Part on Obligations, Vol. 4, 4th ed. (2014), p. 352.

contribute was made in the correct amount and Gale Songdo refused to contribute), if POSCO sold the collaterals at an unreasonably low price, POSCO shall be liable in contract (the contract setting up the security rights, such as the Unit Pledge Agreement, obviously implies that the security rights shall not be exercised unreasonably) as well as in tort. This is a firmly established position maintained by the Korean Supreme Court.[35]

51.   In a case where a flat was conveyed in trust to the creditor to secure a loan, the Supreme Court explained as follows:

> After the due date of the debt has come and gone, the trustee creditor may lawfully dispose of the property which was conveyed in trust to him to secure the debt because the disposal is one way of exercising the security right. However, if the method of disposal is wrongful – for instance, if the property was sold at a price lower than the appropriate market price, then the disposal shall not only constitute a breach of contract of the trustee creditor (*See* Supreme Court Judgment 80Da2688, dated 26 May 1981), but the trustee creditor shall also be liable in tort if he intentionally or negligently sold the property at a low price in breach of his duty to exercise the security right in an appropriate manner.[36]

52.   The Supreme Court recognises that the party who is entitled to exercise the security right has a (contractual) duty of care to dispose of the collaterals at a just price.[37] If the collaterals are sold at a price which is lower than the appropriate price, the party who thus exercised the security right would in principle be held liable for a breach of contract. The party who exercised the security right in such a manner can only avoid the liability if he proves that he

---

[35]   Lee, Yong Hun, "Legal issues of unjust appraisal or sale of properties offered to secure a debt", *Civil Case Research*, Vol. 5 (1983).

[36]   Supreme Court Judgment 81Da462, dated 22 December 1981, for example.

[37]   Supreme Court Judgment 73Da38, dated 5 June 1973.

was nevertheless not at fault. But the defence of no fault (put forward by a party who failed to discharge his contractual duty of care) is rarely, if ever, accepted in practice.[38]

53.   Alternatively, if the owner of the collaterals brings a tort claim, it is not enough to show that the disposal was at a price lower than the appropriate market price. The negligence or the intent of the tortfeasor must be proven by the party who brings the tort claim. The Supreme Court, however, points out that if the discrepancy between the fair market value and the disposal price is exceptionally great, the negligence of the person who disposed of the collaterals must be presumed.[39]

54.   In the present case, the Tribunal or the Court should additionally take into account the following:

(i)   If POSCO (as a pledgor) complied with its contractual obligation to maintain (together with Gale Songdo) 100% unitholding in the Joint Venture and if POSCO (as the person subrogating the pledgee) complied with the pledgee's statutory duty of care to preserve the commercial value of the collaterals by selling 100% (and no less than 100%) units in the Joint Venture, the disposal of the units in the Joint Venture could have been done without any conflict of interest.

(ii)   If *all* of the units (including POSCO's own units) had been sold, POSCO would have just as much incentive and self-interest as Gale Songdo to achieve best possible price for the collaterals (and then split the proceeds in proportion to their unitholding).

---

[38]   Supreme Court Judgment 69Da112, dated 25 March 1969; Supreme Court Judgment 73Da38, dated 5 June 1973 all rejected the defence of no fault. I am not aware of any case where the defence of no fault was accepted when the lender sold the collaterals at a price lower than what the court would consider a reasonable price.

[39]   Supreme Court Judgment 81Da462, dated 22 December 1981; Supreme Court Judgment 69Da112, dated 25 March 1969.

(iii)     Since POSCO failed to comply with these obligations and arbitrarily chose to sell only the Joint Venture partner's units, POSCO put itself in a serious conflict of interest. POSCO's disposal of its Joint Venture partner's units, as it was done in a conflict of interest intentionally created by POSCO itself, must be presumed to be wrongful.

55.  Gale Songdo and POSCO agreed to waive "any claims against any Pledgee arising by reason of the fact that the price at which the Units have been sold at such private sale may be less than the price at which it could have been sold otherwise."[40] This does not mean that Gale Songdo and POSCO waived claims for the disposal of the units at an *unreasonable* price. A price achieved in a private sale could be higher or lower than the price achievable in other methods of sale. That does not necessarily mean that any of those prices are unreasonable. Gale Songdo and POSCO merely agreed that they would not claim against the Pledgee for the sole reason that other methods of sale could have achieved a 'better' price. Nor did they waive their claims for any negligent or fraudulent disposal of the units. In any event, Gale Songdo has not waived any claim for POSCO's breach of contract or tort. If POSCO's disposal of less than 100% unitholding in the Joint Venture at a remarkably low price is found to be a breach of contract or a tort, Gale Songdo may pursue its remedies against POSCO to the full extent permitted in law.

56.  Under the Korean law, the party seeking to rely on an exclusion of liability or a waiver clause, i.e., POSCO in the present case, must show that the clause, on its true construction, covers the loss which it purports to exclude. The onus is on the party who seeks to avoid the liability. Contractual exclusion of liability must be expressly and unambiguously stated. When considering the validity of a waiver clause, the Korean Supreme Court has repeatedly ruled that "where one party asserts that a contractual clause imposes grave responsibility on the other party [e.g., by absolving the former], such a clause needs to be construed all the more

---

[40]   Section 6.3 of Unit Pledge Agreement.

strictly."[41] Any ambiguity of the contractual language of a waiver clause should therefore work against the party who seeks to avoid the liability.

## IV. Damages under the Korean law

57. Under the Korean law, an award of damage (whether it is contractual damage or tort damage) can only be made in respect of an ordinary loss (the loss which naturally results in the ordinary course of things from a breach or a tortious act) or a special loss (the loss which resulted from a breach or a tortious act due to special circumstances) to the extent it was foreseeable by the party who committed the breach or the tortious act.[42] An award of damage aims to cover not only the loss actually suffered (*damnum emergens*) but also the gain which was deprived (*lucrum cessans*) by the other party's breach or tortious act. The Tribunal's or the Court's reasonable estimate (on the basis of the evidence and pleadings) of what the injured party would have earned in the absence of a breach or a tortious act minus the injured party's actual earnings (which were achieved in spite of the other party's breach or tortious act) should also be included in the damage award.

58. If the Tribunal or the Court finds that

(i)     POSCO's decision to dispose of less than 100% units in the Joint Venture is a breach of Section 4.4 of the Unit Pledge Agreement (obligation to maintain 100% unitholding as long as the Unit Pledge Agreement remains binding) or Section 7.1.1 of 2011 JVA (obligation not to transfer the units without approval by Special Resolution at a General Meeting of Members) because such a transfer was neither contemplated by the parties

---

[41]   Supreme Court Judgment 2000Da33607, dated 19 January 2001; Supreme Court Judgment 2000Da72572, dated 24 May 2002.

[42]   Article 393 of the Korean Civil Code which stipulates the contractual damage shall apply *mutatis mutandis* to an award of tort damage (Article 763 of the Korean Civil Code).

nor approved by Special Resolution at a General Meeting of Members at the time the parties concluded the Unit Pledge Agreement;

(ii)     POSCO was not entitled to exercise the subrogation rights against Gale Songdo because POSCO did not make a valid demand for Gale Songdo's contribution in the correct amount and therefore Gale Songdo was not in default of its statutory contribution obligation owed to POSCO; *or*

(iii)    POSCO's sale of Gale Songdo's units was in any event a breach of the Unit Pledge Agreement or a tort because the price was manifestly lower than the reasonable price and because the sale was done in a severe conflict of interest intentionally created by POSCO,

then the Tribunal or the Court should conclude that POSCO shall, under the Korean law, be liable to compensate all causally connected loss occurring from such a breach or a tortious act to the extent the loss was foreseeable.

I confirm that I have made clear which facts and matters referred to in this report are within my knowledge and which are not. Those that are within my own knowledge I confirm to be true. The opinions I have expressed represent my true and complete professional opinion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Signed

Professor Keechang Kim

Dated this 18th day of November 2019

Seoul, Republic of Korea

29